UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**
JUN 2 8 2007


CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 07-M06 |
| Plaintiff, | * | |
| vs. | * | FINDINGS OF FACT and CONCLUSIONS OF LAW and CERTIFICATION |
| SAMIR AVDIC, | * | |
| Defendant. | * | |

This matter came before the court for an extradition hearing on Tuesday, June 5, 2007.[1] The Defendant was present and represented by his counsel of record, Mr. Timothy Wilka. The proceedings were translated into Defendant's native language by interpreter Teodora Burian. The Government was represented by Assistant United States Attorney Jeffrey Clapper.

## JURISDICTION

A Complaint was filed in the United States District Court for the District of South Dakota, Southern Division, charging Defendant, Samir Avdic, with murder in violation of Article 36, paragraph 1 of the Criminal Code of the Republic of Srpska. The charge was made by an Assistant United States Attorney, acting on behalf of the Government of Bosnia Herzegovina pursuant to the Treaty between the United States and Serbia for the Mutual Extradition of Fugitives from Justice. Judge Piersol signed an Order of Designation dated March 22, 2007 (Doc. 10). Jurisdiction is proper, therefore, pursuant to 18 U.S.C. § 3184 and Judge Piersol's March 22 Order.

## INTRODUCTION

The purpose of an extradition hearing is not to determine guilt or innocence, but to establish:

1. There exists a valid extradition treaty between the United States and the requesting country;

2. The person before the Court is the person being sought by the requesting country;

3. Whether the offense charged is extraditable;

4. Whether the offense charged satisfies the requirement of dual criminality;

---

[1] A transcript of the hearing is on file with the Clerk's office as Doc. 26.

5. Whether there is probable cause to believe the relator committed the offense charged;

6. Whether the required documents are presented in accordance with United States law, subject to any specific treaty requirements, translated and duly authenticated by a United States consul; and

7. Whether other treaty requirements and statutory procedures are followed.

See Bassiouni, *International Extradition, United States Law and Practice* (4th Ed., 2002, p. 820).

## THE PARTIES' CONTENTIONS

The Government asserts it has met the described requirements. Specifically, the Government asserts:

1. An extradition treaty exists between the United States and Bosnia Herzegovina, as a successor state to Yugoslavia. Serbia and the United States signed a treaty on October 25, 1901, which became effective on June 12, 1902. See EX 2,2 p. 1-9.[2] (Declaration of Virginia Prugh with attached Certified Copy of Treaty). The treaty was in force with the former Yugoslavia. Since the dissolution of Yugoslavia, the treaty has applied to Bosnia Herzegovina as a successor state;

2. Samir Avdic, who appeared in Court on June 5, 2007, is one and the same as the Samir Avdic who is sought by the Bosnian government. See EX 2, 3 p. 9;

3. The charge of which Mr. Avdic has been convicted (murder) is an offense within the Treaty. See EX 2, 2 p. 6 (Article II, ¶ 1).

4. The offense is also a crime in the United States. Dual criminality, therefore, has been established; See EX 2, 4 p. 44 (Bosnian law) and 18 U.S.C. § 1111; SDCL § 22-16-4.

5. The Bosnian Verdict and Sentence provides probable cause; See EX 2, 3 p. 11-17 (original Verdict and Sentence finding guilt and imposing ten year sentence); EX 2, 4 p. 7-10 (reducing sentence to six years).

6. The documents presented by the United States are the appropriate documents,

---

[2]The Government made several Exhibits which were attached to the Complaint (Doc. 1) into an Exhibit at the hearing, which was marked as EX 2. EX 2 contains numerous pages. At the top of the pages are document and page designations from the previous clerk's filing when the documents were attached to the Complaint. Because of the volume, the attachments were separated into five attachments (i.e. 1-1, 1-2, 1-3, etc., each attachment having up to 50 pages). The hearing EX 2 begins with the second attachment, p.1 (1-2, p. 1 of 9). Documents contained in EX 2 will be referred to by "EX 2" followed by the attachment number and page number, i.e. EX 2, 2, p.1.

appropriately authenticated; See EX 2 and originals in Clerk's file.

7. The treaty requirements and the statutory requirements of 18 U.S.C. § 3181 et. seq. have been followed.

Mr. Avdic concedes there is a valid treaty between Bosnia Herzegovina and the United States, that he is the person who has been convicted in Bosnia Herzegovina, that the offense is one covered by the treaty and that it is a crime in both countries, that on its face the Bosnian judgment provides probable cause, and that the documents provided by the Government are in order and properly authenticated. He asserts, however, that he is not extraditable because the confession he gave in Bosnia which forms the basis for his conviction was procured by force. He also asserts he is not extraditable because the "political offense" exception, found in Article VI of the applicable Treaty, should apply.

## DISCUSSION

The function of a Magistrate Judge in an extradition hearing is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction. Collins v. Loisel, 259 U.S. 309, 314-315, 42 S.Ct. 469, 471, 66 L.Ed. 956 (1922). Bosnia, therefore, need not present evidence sufficient to justify a conviction. See also Bassiouni, *International Extradition, United States Law and Practice* (4th Ed., 2002, p. 828). It is accepted practice the probable cause standard must be satisfied in accordance with the law of the United States, which is found in 18 U.S.C. § 3184, and applicable case law. Id. Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence are applicable. See Fed. R. Evid. 1101(d)(3); Fed. R. Crim. P. 54(b); Melia v. United States, 667 F.2d 300, 302 (2d Cir. 1981). Hearsay evidence, therefore, can be considered.

### 1. The Bosnian Verdict and Sentence

The Bosnian government has provided a voluminous document, translated into English, in support of its extradition request. See EX 2. Part of the document consists of the written Verdict and Sentence against Samir Avdic. See EX 2,3, p. 11-17. Pages 12 -13 and 15-16 of the document speak specifically about Samir Avdic. It says:

> 4. AVDIC SAMIR, *son of Abid and Abida, nee Talic, born in Bratunac, previously residing in Seliste, municipality of Bratunac, and now resides in Blazuj, Ilidza Municipality, is hiding (crossed out) born on 23rd March 1967, a Muslim, a BiH citizen, unemployed worker, married, father of one child, literate, has completed elementary school, has not served in compulsory military forces, as recorded in Bratunac Department of Ministry Defense, has*

3

*no previous criminal record, was in detention in the period from 30 May 1996 till 22 April 1997*

*Founding them* **GUILTY for**

\*\*\*
*II*

*Hasic Nedzad and Avdic Samir
For the following offense:*

*On a certain, unidentified day in the second half of August, 1995, in the cave they were hiding together with Mustafic Munib in the area of Poljanica, Srebrenica Municipality, according to the previous agreement decided to kill Mustafic Munib because he was hiding salt from them. So, while all three of them were sitting in the cave, Avdic Samir fired from the shot gun "bokeria" that Hasic Nedzad had given him and fired one shot into the back of Mustafic Munib causing mortal injuries following which the perpetrators dragged his body out of the cave and threw it into down an inaccessible cliff. By committing this act, they have deprived another person of his life.*
\*\*\*\*

*for point two of this verdict Hasic Nedzad and Avdic Samir have committed criminal offense of murder as regulated by Article 36, paragraph 1, RS criminal code-Special Part and in relations to Article 22 RS criminal code--general part.*
*The Court, pursuant to Article 33, Article 41, Article 48 and Article 38, paragraph 2 RS Criminal Code--General Part pronounced the accused Hasic Nedzad sentence of 20 (twenty) years imprisonment for the criminal offense given in part I of the verdict and for the criminal offense under Part II of the verdict, sentence of 10 (ten) years of imprisonment.*

*The Court thus has*
**SENTENCED**
**ACCUSED AVDIC SAMIR** *to 10 (ten) years of imprisonment inclusive of the detention term between 30 May 1996 to 22 April 1997;*
\*\*\*\*

The Bosnian Court Panel President (Kitic Ljubomir) also explained the sequence of events which led to Mr. Avdic's guilty verdict (See EX 2, 3 p. 15):

*When he was giving his statement to the investigating judge in Zvornik Basic Court, the accused Avdic Samir was able to admit that he committed the offense he was charged for and he explained everything in detail, precisely and logically. He described in detail, the reasons or the motive, the agreement reached between him and Hasic Nedzad, weapons type, even the ammunition or bullets he had used, the position and body part of Munib Mustafic whom he shot; his and Nedzad's behavior afterwards, when they threw Munib's dead body from the cave down the steep rock. The conflict between Nedzad. The conflict between Nedzad Hasic and Samir Avdic, which happened one day before the other accused, without Samir, decided to leave in the direction of Tuzla, is unquestionable. Avdic Samir precisely described that conflict, and so did Nedzad too, but Nedzad did not state that on that occasion he had beaten Samir and inflicted injuries upon him. However, in the IPTF report on the chronology of events it is stated that on 30 May, 1996, after Samir had been arrested, a 3 cm long scar was noticed on his forehead. Eventually, as a result of that conflict,*

4

*there came Avdic Samir's confession that he, Samir, was the one who killed Munib. The confession made by Avdic seems logical because, objectively, he was the one who had pulled the trigger on the gun, who had fired the bullet which had inflicted deadly injuries on Munib. Being aware of that Nedzad was forcing Samir to admit having completed the offense thinking that this would free him for being suspected for the murder of Munib. There was an additional reason for his behavior because there was a rumor among the accused that Samir had Nedzad in his hands and that it was in fact Nedzad who had actually killed Munib as the accused Husic Behudin stated in his defense at the main hearing.*

\*\*\*

*Crime scene report made by District Court describes the terrain a the site where the cave in which Samir, Nedzad and Munib stayed is situated, and with regard to the fact that below that cave there is a big, inaccessible, nearly vertical rock, precisely like the one described by Samir, the Court finds that it is precisely the cave where the critical event happened, and the cave was located by the accused Hasic, who took the investigation tem to it.*

*The Court has concluded that the barrel of the gun, a part of a "bokeria" shotgun, was found at the site, and that was the gun that Samir has used to shoot Munib. This has proven to be true having in mind the findings of the ballistic expert stating that such shotgun could also be used with cartridges with a "brener" or with a ball, and Samir claims that was precisely the kind of bullet which he used.*
\*\*\*

*The Court believes that the defense statements given by the accused Samir at the main hearing[3] claiming that Munib had committed suicide and that it was Hasic Nedzad who had seen his corpse, and the statements by the accused Hasic Nedzad that he did not know what happened to Mustafic Munib, were an attempt to avoid their personal responsibility in the mentioned event.*
*Given the situation, the court has found the defendants Avdic Samir and Hasic Nedzad had previously conspired to deprive Mustafic Munib of his life because he had been hiding salt from them, so after arguing who would actually do it, Avdic Samir shot Mustafic Munib in the back from a shotgun given to him by Hasic Nedzad and having killed him, they threw him off a cliff below the cave. The court has concluded that all characteristics of a criminal offense of murder as regulated by Article 36, paragraph 1 RS Criminal Code Special Part, in relations to Article 22 RS Criminal Code -general part, were contained in the actions done by Hasic and Avdic. The Court has found that in committing the offense they have been charged with, Hasic and Avdic are to be treated as co-perpetrators. Both of them were aware of their joint actions having previously coming to an agreement they had completely adhered to: Avdic Samir fired from a shotgun given to him by Hasic, inflicting lethal injuries to Mustafic, with both of them throwing Mustafic down the cliff. Hasic Nedzad did not participate directly in the offense, i.e. in the firing of the bullet from the rifle, but*

---

[3] It is unknown what the Tribunal meant by this statement, since Mr. Avdic testified, and the Tribunal acknowledged elsewhere, that Avdic was not present at the conclusion of the Main Hearing in December, 1998. See TR 27; EX 2, 4 p. 41 (Order for Wanted Circular stating Avdic was a fugitive as of December 11, 1998). Mr. Avdic was represented by counsel at the trial. See EX 2, 3 p. 15. In any event, Avdic's recantation was somehow conveyed to the Tribunal and it was acknowledged in the Verdict and Sentence.

*it can be inferred from his behavior that he had been aware that the joint act of him and Samir is actually a criminal offense. Anyhow, Nedzad is the one to present the idea to kill Mustafic Munib. Obviously, Nedzad knew Samir was the one who had fired from the rifle and that was the reason why he made Samir to confess it in front of the others thinking that he would avoid his own responsibility for Munib's death.*

See EX 2, 3 p. 15-16.

It is also observed that on appeal, the Bosnian tribunal acknowledged Mr. Avdic's claim he had been forced to give his original confession. See EX 2, 4 at p. 9. The tribunal took these claims into consideration in determining the reliability and credibility of Mr. Avdic's previous statements and statements given at trial, and rejected his recantation. Id.

**Mr. Avdic's Extradition Hearing Testimony**

Mr. Avdic was the lone witness at the extradition hearing. He lived in Sioux Falls for two and one-half years before he was arrested on the extradition warrant. TR 15. Before he lived in Sioux Falls, he lived in Waterloo, Iowa for three years. TR 15. Before that, he lived in Tucson, Arizona for about four years. TR 16. He had a Social Security card (EX D), which he received when he came to Tucson, Arizona from Switzerland on April 26, 2000. TR 16. He also produced an I-94 form (EX E) which he received when he arrived in Tucson from Switzerland. TR 17. Mr. Avdic also produced his passport (EX B), which was issued in Bern, Switzerland in 1999. TR 17. Finally, Mr. Avdic produced a Bosnia Herzegovinian ID card, (EX C) issued in 1997.

The incident which forms the basis of these proceedings occurred in August, 1995. Mr. Avdic explained that he fought in the war in Bosnia as a member of the Armed Forces of the Republic of Bosnia and Herzegovina from June 21, 1992 through April 22, 1996. TR 29-30. In August, 1995, he was hiding in the woods near Srebrenica after the area fell into the hands of the Serbian forces. TR 31-32. He was running from the killing, raping and starvation that resulted from the Serbian control of the area. Id. In April, 1996, Mr. Avdic was either captured or surrendered to the United Nations Peacekeeping Force. TR 35. He was first taken to a police station in Zvornik for one month. TR 35. While he was held there, he was beaten. TR 36. Mr. Avdic demonstrated injuries to the Court that he claims he received while a prisoner at the Zvornik jail. He demonstrated a scar on his head, a scar on his arm, and a bullet wound on his arm. TR 39-40. He explained these injuries were inflicted by his Serbian captors. Id. Some of his fellow prisoners were shot. TR 36. After his fellow prisoners were shot, Mr. Avdic confessed to Munib's murder. TR 37. He claims he did not actually kill Mustafic Munib. TR 32, 34. When the Government cross-examined Mr. Avdic about the court proceedings he received in Bosnia, he replied "no man has ever asked us any

6

questions. And I know that I did not have court proceedings the way I have them now here today." TR 42.

Mr. Avdic was later taken to a prison in Bijeljina. TR 37. This prison was located near the border with Serbia, by the Drina River. TR 23. He was held there for eleven months. TR 37. He was released from that prison by the Red Cross on April 24, 1997. TR 23-24, 37, EX A. A trial was held in Bijeljina in December, 1998 on the charges against Mr. Avdic for the murder of Mustafic Munib. Mr. Avdic was represented by a lawyer, but he (Avdic) was not present for the trial. TR 27. In December, 1998, Avdic was living in Sarajevo, about a two hour drive from where the trial occurred. TR 27-28. He explained that he was not allowed to attend the trial. TR 27. The Court convicted Avdic and imposed a sentence of ten years. His co-defendant received a sentence of 20 years. TR 37-38. He believes his co-defendant is now in Switzerland after serving three months in jail. TR 38.

Mr. Avdic believes it is not the federation of Bosnia Herzegovina that wants him returned, but rather the Serbs. He explained that "the Muslims want to have more Serbs in the prison, and the Serbs want to have more Muslims in the prison. And this is all a money-making machine, and they are really selling people This is really like a market." TR 41.

### The Effect of Mr. Avdic's Hearing Testimony

Mr. Avdic's testimony was allowed even though extradition treaties do not contemplate the introduction of testimony by the respondent to contradict the demanding country's proof. In Re: Extradition of Mainero, 990 F.Supp. 1208, 1219 (S.D. Cal. 1997). "Extradition treaties do not contemplate the introduction of testimony of live witnesses by the Respondent to contradict the demanding country's proof." Id. citing Bingham v. Bradley, 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed.2d 1136 (1916). Explanatory evidence is allowed only to clearly negate the probable cause showing. Id. It has been held that it is permissible in an extradition hearing to allow the defendant to introduce evidence which tends to obliterate probable cause, but not that which only tends to contradict it. Id. The Magistrate judge who conducts the extradition proceeding has "wide latitude" in admitting evidence. Id. The Magistrate need only determine whether there is "any" evidence sufficient to establish probable cause. Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986). Because it is impossible to discern in advance whether live testimony will obliterate or merely contradict the demanding country's proof, it is this Judge's practice to err on the side of liberality and allow the live testimony.

After careful consideration of all the evidence, the files and records, the briefs and oral

arguments of the parties, the Court hereby **CERTIFIES** to the Secretary of State, the following Findings of Fact and Conclusions of Law.[4] To the extent any of the Findings are erroneously designated Findings of Fact, and are Conclusions of Law or mixed Conclusions of Law and Findings of Fact, the same are incorporated by reference in the Conclusions of Law that appear here. To the extent any of the Conclusions are erroneously designated Conclusions of Law, and are Findings of Fact or mixed Conclusions of Law and Findings of Fact, the same are incorporated by reference in the Findings of Fact that appear here.

## FINDINGS OF FACT

1. There exists an extradition treaty in full force and effect between the United States and the Government of Bosnia Herzegovina. See EX 2, 2 p. 5-9.

2. The person who appeared in the courtroom on June 5, 2007, is the Samir Avdic whose extradition is sought by the Bosnian government. Identity is not seriously disputed by Mr. Avdic, and is established by the extradition request, which contains a photograph and a fingerprint of Mr. Avdic. See EX 2, 3 p. 9. The information provided by the Government matches the information Mr. Avdic provided to the Court. See EX B (passport), EX C (Bosnia Herzegovina ID card).

3. Mr. Avdic was convicted of murder. Murder is a criminal offense under Article 36 paragraph 1, RS of the Bosnian Criminal Code. The offenses mentioned in the Bosnian Verdict and Sentence, therefore, are extraditable. See EX 2,4 p. 44.

4. The offenses charged in Bosnia are also crimes in the United States. Dual criminality, therefore, has been established. See 18 U.S.C. § 1111, S.D.C.L. § 22-16-4.

5. The documents submitted by the Bosnian government are sufficient to permit a finding of probable cause to believe Mr. Avdic committed the offenses of which he was convicted in Bosnia. The Verdict and Sentence imposed by the Bosnian Tribunal included not only Mr. Avdic's original confession, but also consideration of his later recantation (claiming Munib committed suicide), his claim that his confession was forced, the testimony of his co-defendant Nedzad (denying either of them killed Munib), the claims of others that Nedzad killed Munib, and the investigation of the crime scene and physical evidence which corroborated Avdic's original confession.

---

[4]The ultimate decision whether Mr. Avdic will be extradited rests with the Secretary of State. 18 U.S.C. § 3186; United States v. Kin-Hong, 110 F.3d 103, 109-110 (1st Cir. 1997).

6. The extradition documents presented by the government are in the proper form and have been duly authenticated by the appropriate governmental officials. See EX 2. (Requests signed and documentation certified by Kirk Smith, Ambassador to Bosnia Herzegovina, Copy of Treaty accompanied by Declaration of Virginia Pruh and Certification of Condoleeza Rice).

7. The Treaty requirements and the statutory requirements have been followed pursuant to 18 U.S.C. § 3181 et. seq.

8. The Court takes judicial notice that the entire Balkan region including Bosnia Herzegovina was involved in an armed conflict beginning in the early 1990's through the time when the Dayton peace accords were reached in Dayton, Ohio in November 1995 (signed in Paris in December, 1995). This armed conflict can be classified as a "violent political disturbance or uprising" in the requesting country. The incident which is the subject of this extradition request occurred in August, 1995 near Poljanica, in the Srebrenica Municipality. Mr. Avdic explained he had been living near the area at the time when the Serbian forces claimed Srebrenica. In July, 1995 a particularly severe uprising "the Srebrenica Massacre" occurred near the area where alleged incident which gives rise to this extradition request (Srebrenica Municipality, Republika Srpska, Bosnia Herzegovina) occurred. See e.g. www.un.org/apps/news/story article dated April 11, 2007 *"UN Tribunal Transfers Bosnian Serb Convicted over Srebrenica Massacre to Finland."* The Srebrenica Massacre is well documented and resulted in the killing of an estimated 7,000 to 8,000 Muslim men and boys by units of the Army of Republika Srpska (the Bosnian Serb forces). The Muslim elderly, women and children were also raped, killed or deported to refugee camps as a result of the Srebrenica Massacre.

For a description of the situation in the area at the time, see www.wikipedia.org/wiki/Srebrenica_massacre. Refugees "did not know what to do next or where to go; they managed to stay alive by eating snails, leaves and mushrooms. The atmosphere was one of tension, hunger and desperation. . . . Some wandered around for months, either alone or groups of two, four or six men . . .To feed themselves the men took potatoes and other vegetables from the fields around the Serbian villages at night." Id. Before the disagreement between the three men (Avdic, Nedzad and Munib) which allegedly resulted in Munib's murder, Munib had been hiding in a cave (or, as described by Mr. Avdic, in the woods) with Avdic and Nedzad since the fall of Srebrenica in July, 1995. EX 2, 3 at p. 22, TR p. 31-32, 36. The Verdict and Sentence explain that Mr. Avdic and his co-defendant, Hasic Nedzad, conspired to kill their former confederate Mustafic Munib after Munib hid provisions (salt) from them. See EX 2,3 at p. 20.

9

## CONCLUSIONS OF LAW

1. The dual criminality requirement is met. Murder is a crime under Bosnian law pursuant to Part 2, Chapter 6, Article 36 of the Bosnian Criminal Code. See EX 2, 4 p. 44. Murder is a crime in the United States pursuant to 18 U.S.C. § 1111 and S.D.C.L. § 22-16-4.

2. The Bosnian tribunal which heard all the evidence found Mr. Avdic guilty. While United States case law holds that an in absentia conviction should be treated as if it were merely a charge, not a conviction, in an extradition proceeding, that an independent judicial officer in the requesting country heard the evidence and found it sufficient to convict can establish probable cause. See Esposito v. I.N.S., 936 F.2d 911, 914 (7th Cir. 1991 ("Even if Esposito were correct that in absentia convictions ought not to be treated as evidence of guilt, they may certainly stand for something less: at the very least, in absentia convictions properly constitute probable cause to believe that the petitioner is guilty of the crimes in question . . . We do not believe that in absentia convictions are, solely by virtue of their in absentia nature, so fundamentally infirm as to preclude the Board from considering them for this limited purpose"); United States v. Bogue, 1998 WL 966070 (E.D. Pa.) ("A conviction, although obtained in absentia, provides sufficient evidence of criminality to satisfy the probable cause requirements of 18 U.S.C. § 3184."); Lindstrom v. Gilkey, 1999 WL 342320 (ND Ill) ("Certified proof of conviction for the crimes at issue in an extradition request is sufficient to establish probable cause.").

3. The extradition request meets the probable cause requirement. A probable cause finding may be based entirely on hearsay adduced at a proceeding at which the accused is not present. See Costello v. United States, 350 U.S. 359, 363-364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) (upholding validity of grand jury indictment based on hearsay evidence).

4. "Although a person whose extradition is sought has the right to introduce evidence at the extradition hearing, that right is circumscribed: An accused person's right to produce evidence at an extradition hearing is limited. The rule is that the accused has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility. On the other hand, the accused has the right to introduce evidence which is explanatory of the demanding country's proof. . . . The task of defining the precise boundary between admissible explanatory evidence and inadmissible contradictory evidence is entrusted to the sound discretion of the extradition judge. . . . The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits." Sandhu v. Burke, 2000 WL 191707 (S.D.N.Y.) (citations omitted, punctuation altered).

There is a split of authority regarding the admissibility of recantations. In some instances, evidence of torture and/or recantation is a relevant inquiry. That is because "what tends to obliterate probable cause may be considered by the extradition court but not what merely contradicts it." Id. See also In the Matter of Extradition of Contreras, 800 F.Supp. 1462, 1465 (S.D. Tex. 1992) ("[It] is obvious . . .that if the only evidence of probable cause were the confessions, and if sufficiently recanted, then the existence of probable cause would be negated."). For the reasons explained in Finding of Fact No. 5, the torture/recantation evidence presented by Mr. Avdic does not obliterate probable cause. The evidence he presented merely contradicts the evidence contained in the Verdict (i.e. that either Mustafic Munib killed himself, or was killed by Hasic Nedzad).

5. Article VI of the Treaty provides:

> A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try to punish him for an offense of a political character.
> No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished, for any political crime or offense, or for any act connected therewith, committed previously to his extradition.
> If any questions shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the Government on which the demand for surrender is made, or which may have granted the extradition, shall be final.

This article is the "political offense exception" to extraditable crimes. "For an act to fall within the political offense exception to the Treaty, the Court must determine (1) that there was a violent political disturbance, such as a war, revolution, or rebellion, at the time and place of the alleged act and (2) that the acts charged were recognizably incidental to the disturbance." In the Matter of the Extradition of Demjanjuk, 612 F. Supp. 544, 570 (N.D. Oh. 1985) (citations omitted). The initial burden of proof is on the defendant to establish the essential elements of the political offense exception. If the defendant establishes the essential elements, only then does the burden shift to the Government to prove the crime charged in the Complaint is not of political character. United States v. Pitawanakwat, 120 F.Supp.2d 921, 928 (D. Or. 2000).

A "purely" political offense involves conduct against the sovereign or its political subdivisions but has no elements of a common crime. Examples of "pure" political offenses include treason, sedition and espionage. "While the *purely* political offense exclusively affects the public interest and causes only a public wrong, the *relative* political offense also affects a private interest,

11

and constitutes at least in part, a private wrong in the nature of a common crime against person or property, and is committed in furtherance of a political purpose." M. Bassiouni, *International Extradition: United States Law and Practice* (4th Ed. 2002) Ch VIII, § 2.1.5, p. 607 (emphasis added). Mr. Avdic asserts the offense in question is a relative political offense. See Doc. 21, p. 4.

The Court has already noted the entire region was embroiled in a violent political disturbance at the relevant time. (See Finding of Fact No. 8). The Court may take judicial notice of a political disturbance in an extradition case, and does so in this case. See Arambasic v. Ashcroft, 403 F.Supp.2d 951 (D.S.D. 2005); Ramos v. Diaz, 179 F.Supp.459, 462 (S.D. Fla. 1959).

The more difficult issue is whether the alleged incident was "incidental" to the political disturbance. Webster's Dictionary Second College Edition (1984) defines "incidental" as "happening in connection with something more important; casual, . . ." The case law, however, requires more than a casual link between the crime and the political disturbance to establish the second prong of the political offense exception. One Court has explained that isolated acts of violence during political disturbances do not qualify for the political offense exception "absent a direct link between the perpetrator, a political organization's political goals, and a specific act." Eain v. Wilkes, 641 F.2d 504, 521 (7th Cir. 1981). Described another way, "an offense having its impact on the citizenry, but not directly upon the government, does not fall within the political exception." Id. Judge Piersol noted that "given the many variations of criminal activity and of political acts, no one test seems possible for what is subject to the political offense exception. Instead, the statement of the Supreme Court's Ornelas v. Ruiz position . . . should be followed [to consider] the character of the foray, the mode of attacks, the persons killed or captured, and the kind of property taken or destroyed." Arambasic v. Ashcroft, 403 F.Supp.2d 951, 963 (D.S.D. 2005) quoting, Ornelas v. Ruiz, 161 U.S. 502, 511, 16 S.Ct. 689, 40 L.Ed.2d 787 (1896). A common crime is unlikely to be encompassed within the political offense exception "especially when the tie to the larger political cause [is] ambiguous . . ." Eain v. Wilkes, 641 F.2d at 523. As noted by Judge Piersol in Arambasic, " attacks by military units on other combatants would be acts of a political character . . . [but] political strife is not a license for the military or anyone else to do whatever they wish to the defenseless that have come under their power." Arambasic, 403 F.Supp.2d at 953.

Mr. Avdic's alleged attack on his former confederate for failing to share his salt was "incidental" to the political disturbance that was occurring at the time only in the sense that (as explained by the article cited above) the deadly disagreement between friends over food rations was probably brought about by the harsh times caused by the war. This, however, is not sufficient to

12

bring a common crime within the political offense exception. The murder had no impact whatever on any government or political cause, Bosnian, or Serbian, but rather only on its victim. The foray was not combat of any kind but rather an attack by two friends against another as a result of a personal disagreement over scarce resources. Munib's murder was an "isolated act of social violence undertaken for personal reasons" which occurred during a time of political upheaval. As such, it is outside the scope of the political offense exception. Eain, 641 F.2d at 521.

      6.      In a different, but somewhat related argument, Mr. Avdic asserts he should not be extradited because he is being haled back to Bosnia now, over ten years after the alleged crime and nearly ten years after his conviction, as a subterfuge for the requesting party's political agenda--for "political reasons." [5] In other words, he asserts he is being selectively prosecuted based on his ethnicity, which is different from the ethnicity of the persons currently in power in Bosnia Herzegovina who are seeking his extradition. Humanitarian issues, however, are not appropriately considered by the Magistrate Judge, but by the Secretary of State. "This is not a proper matter for consideration by the certifying judicial officer . . . the degree of risk to [the relator's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch . . . it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." Ahmad v. Wigen, 910 F.2d 1063, 1066 (2nd Cir. 1990). ). The Ahmad Court explained that "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id.; United States v. Kin-Hong, 110 F.3d 103, 110-111 (1st Cir. 1997) ( "Another principle that guides the courts in matters concerning extradition is the rule of non-inquiry. More than just a principle of treaty construction, the rule of non-inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding. Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system and from inquiring into the procedures or treatment which await a surrendered fugitive

---

[5] For a good discussion about the distinction and the reason for different judicial treatment of the political offense exception and the "subterfuge" argument, see Eain v. Wilkes, 641 F.2d at 516-517 (explaining that "a judicial decision that . . .establishes an American position on the honesty and integrity of a requesting foreign government is distinguishable from a judicial determination that certain events occurred and specific acts of an individual were or were not connected to those events. The latter type of a decision simply categorizes the facts involved in a given case and then construes the treaty to determine whether or not the facts fall within its ambit. Thus the Judiciary's deference to the Executive on the "subterfuge" question is appropriate since political questions would permeate any judgment on the motivation of a foreign government.").

in the requesting country. The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citations omitted). Certification of Mr. Avdic's extraditability, therefore, will not be refused as a result of his claim of selective prosecution. See also Mironescu v. Costner, 480 F.3d 664 (4th Cir. 2007) (rule of non-inquiry does not preclude habeas review of *Secretary's* extradition decision, but FARR Act precluded review where claim was based on claim that defendant would be tortured upon his return).[6]

## CERTIFICATION

IT IS, THEREFORE, CERTIFIED to the Secretary of State that Samir Avdic is extraditable to Bosnia Herzegovina on the charges for which extradition is sought. There is no defense to extradition under the treaty which is available to Mr. Avdic. The grounds asserted by Mr. Avdic do not justify denial of extradition. Pursuant to 18 U.S.C. § 3184, these findings are CERTIFIED and forwarded, along with the record in this case and all of the testimony taken during the extradition hearing, to the Secretary of State so that a final decision regarding extradition may be made.

Dated this 28th day of June, 2007.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk

By *Shelly Margulies*, Deputy

(SEAL)

---

[6] The inquiry would be premature in this case because the Secretary has not yet received Mr. Avdic for extradition, let alone made a decision about whether to extradite him.